**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA and ARESTY INSTITUTE OF EXECUTIVE EDUCATION AT THE WHARTON SCHOOL,<br><br>Plaintiffs,<br><br>v.<br><br>GUIDO MOLINARI,<br>JOHN REED CATALDO, and<br>STEPHANIE HURDER,<br><br>Defendants. | Civil Action No. |

# COMPLAINT

Plaintiffs, Trustees of the University of Pennsylvania and Aresty Institute of Executive Education at The Wharton School (collectively, "Plaintiffs" or "Wharton"), by and through undersigned counsel, hereby file the following Complaint against Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder (collectively, "Defendants"), and state as follows in support thereof:

## I. THE PARTIES

1. Plaintiff Trustees of the University of Pennsylvania is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania with a headquarters located in Philadelphia, Pennsylvania.

2. Plaintiff Aresty Institute of Executive Education at The Wharton School is an institute within The Wharton School of the University of Pennsylvania that is an unincorporated business unit operated by Plaintiff Trustees of the University of Pennsylvania; it is not separately organized under the laws of any state.

3. Plaintiffs are collectively referred to as "Wharton."

4. Defendant Guido Molinari ("Molinari") is a founding partner and shareholder of Prysm Group LLC ("Prysm"). At all times relevant to this claim, Molinari exercised management authority and control over Prysm and the actions undertaken by Prysm, including those described herein. Guido Molinari is a resident of the State of Illinois.

5. Defendant John Reed Cataldo ("Cataldo") is a founding partner and shareholder of Prysm Group LLC ("Prysm"). At all times relevant to this claim, Cataldo exercised management authority and control over Prysm and the actions undertaken by Prysm, including those described herein. Cataldo is a resident of the State of Florida.

6. Defendant Stephanie Hurder ("Hurder") is a founding partner and shareholder of Prysm Group LLC ("Prysm"). At all times relevant to this claim, Hurder exercised management authority and control over Prysm and the actions undertaken by Prysm, including those described herein. Hurder is a resident of the State of California.

## II. JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Wharton and each of the Defendants, Guido Molinari, John Reed Cataldo, and Stephanie Hurder. Further, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Accordingly, the parties are citizens of different states and the diversity of citizenship requirement in 28 U.S.C. § 1332(a) is satisfied.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims discussed herein occurred in the Eastern District of Pennsylvania. Venue is also proper because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## III. OPERATIVE FACTS

9. The Wharton School is widely considered one of the best business schools in the world. The Wharton School is an institution within the University of Pennsylvania, a non-profit higher education institution in Philadelphia, Pennsylvania.

10. The Wharton School was founded in 1881 as the first collegiate business school and is recognized globally for intellectual leadership and ongoing innovation across every major discipline of business education.

11. Through the Aresty Institute of Executive Education, the Wharton School provides certain online educational programs for individuals, organizations, and executives that result in non-degree, non-credit certifications.

12. On June 22, 2021, Prysm executed a Master Online Course Resale Agreement (the "Agreement" or "MSA") with the Trustees the University of Pennsylvania, acting through the Aresty Institute of Executive Education at the Wharton School for the development, marketing and distribution of online classes. A true and correct copy of the Agreement is attached hereto as Exhibit A and incorporated herein.

13. On June 22, 2021 and on April 12, 2022, Prysm executed separate Statements of Work ("SOW") with Wharton with respect to the resale of separate Wharton Online courses related to the "Economics of Blockchain and Digital Assets Executive" and the "Metaverse Economy," respectively. True and correct copies of the SOWs are attached to the Agreement.

14. In late 2022 and early 2023, Wharton became aware that Prysm had prepared certain pitch decks for potential investors and acquirors that used Wharton's confidential information in violation of the provisions of the Agreement.

15. Section 11.1 of the Agreement explicitly states that "the existence and contents of this Agreement and any SOW shall be deemed 'Confidential Information,'" subjecting the contents

of the Agreement and the SOWs to strict confidentiality provisions. *See* Agreement § 11.1.

16. The pitch decks disclosed the financial and other terms of the Agreement and the SOWs to potential investors and acquirors without Wharton's consent and in material breach of Section 11.1.

17. At no point did Wharton authorize Prysm to divulge the existence or contents of these contracts, the disclosure of which (regardless of the truthfulness of the disclosure) will impact Wharton's ability to negotiate and conclude engagements on different or more favorable terms in the future.

18. Prysm was not authorized to use Wharton's trademarks and logos (defined as the "Wharton Marks" in the Agreement) in its pitch decks.

19. Under Section 5.1(iii) of the Agreement, "[Prysm] shall not use the […] Wharton Marks for any purposes beyond the scope of the license granted in this Agreement." *See* Agreement § 11.1.

20. Section 5.2 goes on to describe, in explicit detail, exactly how Prysm may, and may not, use Wharton's Marks in accordance with its limited license:

> 5.2 Marketing.
>
> (i) […] [Prysm] shall comply with any Wharton policies and guidelines regarding the type, nature and quality of any marketing or promotional materials regarding the Courses and/or displaying of any Wharton Mark. In the event that Wharton objects to any of [Prysm]'s marketing or promotional materials for the Courses, including but not limited to [Prysm]'s website, [Prysm] shall immediately cease distributing such materials unless and until otherwise notified in writing by Wharton.
>
> (ii) License to Marketing Content. Subject to the terms and conditions of this Agreement, Wharton grants [Prysm] a limited, non-exclusive, royalty-free, non-sublicensable, nontransferable and non-assignable license during the Term to copy, distribute and publicly display the Wharton Marketing Content and Marks solely for the purpose of marketing the Courses.

> (iii) Restrictions on use of Wharton Marks. [Prysm] agrees: (a) not to display Wharton's Marks in any way that […] suggests that Wharton has created, sponsored, or endorsed [Prysm]'s products, services or content; (b) that all use and display of Wharton's Marks will be in accordance with any branding guidelines provided in writing by Wharton; and (c) that any display or use of the Wharton's Marks or Marketing Content is subject to Wharton's prior approval pursuant to the Section below entitled "Approval of Marketing Materials." All goodwill accrued from [Prysm]'s use of Wharton's Marks or Marketing Content shall inure to the benefit of Wharton.
>
> (iv) Approval of Marketing Materials. [Prysm] shall submit all oral or written marketing, advertising or promotional announcements, materials, press releases or blogs, or any other materials that include Wharton's Marks or Marketing Content and a written description of all relevant promotional activities [Prysm] wishes to undertake, to Wharton and shall not distribute such Marketing Materials or commence such promotional activities, unless and until Wharton has approved the relevant Marketing Materials and promotional activities in writing (email acceptable). Wharton shall use commercially reasonable efforts to respond to submissions for approval of Marketing Materials and/or promotional activities with an approval or denial given (with explanation) within twenty (20) business days following its receipt of such submission; provided that if Wharton does not respond within such twenty (20) day period, the applicable Marketing Materials or promotional activities shall be deemed rejected.
>
> (v) Neither party will knowingly alter or permit the alteration of the other Party's Marks (including the removal of any copyright notices, trademark notices, or other proprietary legends) without the other Party's prior written approval. Each Party will cease using any Marks of the other Party on any materials, whether tangible or intangible, immediately upon receipt of written notice from the other Party to cease such use. […]
>
> (vi) [Prysm] may not co-brand, co-advertise, bundle, or combine in any way, the Wharton Marks or the Courses with the marks or products of any other party (other than [Prysm] in accordance with this Agreement) unless approved in writing in advance by Wharton.

*See* Agreement § 5.2.

21. At no point did Wharton authorize Prysm to use the Wharton name or logo in its pitch books to potential investors or acquirors.

22. In particular, Prysm failed to submit any such slide decks to Wharton for approval in accordance with Section 5.2(iv) of the Agreement, let alone obtain such approval.

23. Similarly, under Section 5.2(vi) of the Agreement, Prysm was expressly forbidden from diluting the Wharton Marks by using them in association with other parties' marks, yet Prysm did exactly that with the (presumably similarly unauthorized) logos of MIT, Columbia, and USC in a slide awkwardly named "Prysm Group Is the Corporate Learning Leader for Deriving Business Value from Emerging Technologies."

24. In addition, under Sections 14.4 and 12.5(ii) of the Agreement, Prysm was operating under extremely strict guidelines in terms of how it could refer to its relationship to Wharton, and was expressly prohibited from referring to itself as in a "partnership" with Wharton, but did just that in a slide entitled "Zero Course Delivery Costs Drives Pure Profit at Scale."

25. This legal term of art overstated Wharton's relationship with Prysm, falsely indicated that Wharton has an ownership or managerial oversight of Prysm, and could subject Wharton to vicarious liability for, among other things, Prysm's potential material misstatements to its potential investors and acquirors.

26. As the "Wharton" name is the most important piece of intellectual property of this country's first business school, the Trustees of the University of Pennsylvania holds the trademark to both the name "Wharton" (Reg. # 1892916) as well as to the Penn "shield" (Reg. # 1803445), both of which Prysm cavalierly used for its own profit in these pitch decks.

27. Based on these multiple material breaches of the Agreement, on February 7, 2023 Wharton sent Prysm notice of its intention to terminate the Agreement for "Cause" in accordance with Section 12.3 of the Agreement. *See* Exhibit B.

28. Because Prysm's breaches of Sections 5 and 11 of the Agreement could not be

cured, the Agreement terminated on its own terms within thirty (30) days of the notice, which was March 9, 2023. *Id.*

29. Wharton also gave Prysm notice that each SOW will also terminate concurrently with the Agreement on March 9, 2023. *Id.*

30. The February 7, 2023 notice also included Invoice No. WOL-0020839 in the amount of $2,937,637 billed to Prysm (the "Invoice"). *See* Exhibit B.

31. The amount billed in the Invoice is based on Prysm's obligations under both the SOWs to remit to Wharton a fee equal to the *greater* of: 40% of its "Gross Revenue" for such Course, specifically defined as 40% of "the number of Client Learners who have registered for the Course, times the Course Fee, less any refunds actually made to participants pursuant to a standard refund policy (provided that such refunds are consistent with reasonable commercial practices)" *or* the "Guaranteed Minimum Fee" of $500,000 per Course per year. *See* Exhibit A.

32. According to the WOL Sales and Charge Report (the "Charge Report") provided by Prysm to Wharton in January 2023 for CY 2022, the "gross total" of Wharton Online Course sales as of December 31, 2022 was $8,557,510. *See* Charge Report, attached hereto as Exhibit C.

33. The Charge Report then proceeds to net-out $235,917.50 in "reimbursements" (for purposes of this calculation, as good faith "refunds actually made to participants pursuant to a standard refund policy," in accordance with the definition of "Gross Revenue"), leaving an adjusted gross revenue for the period of $8,321,592.50, 40% of which (i.e., Wharton's share) would be $3,328,637.

34. Subtracting from this amount the previously paid "Guaranteed Minimum Fee" of $500,000 pursuant to SOW #1, the remaining fees due to Wharton under SOWs #1 and #2 total $2,828,637.

35. Wharton (i) has added to this subtotal the initial installment of the Guaranteed Minimum Fee of $250,000 under SOW #1 for "Year 2" of the Blockchain course that began on January 30, 2023, and (ii) subtracted the tutoring payments due to Prysm (an expense to be borne by Wharton pursuant to the SOWs and as detailed in Prysm's own Charge Report) of $141,000 ($110,600 for domestic and $30,400 for international), bringing the grand total due to Wharton under the SOWs to $2,937,637, which is reflected in the Invoice.

36. Section 10.2 of the Agreement states that Prysm shall pay Wharton all amounts due with thirty days. *See* Agreement, § 10.2.

37. Thus, the $2,937,637 billed in the Invoice was payable by Prysm to Wharton on March 9, 2023.

38. Despite repeated demand, Prysm has not paid the outstanding Invoice.

39. Pursuant to Section 10.2 of the Agreement, Plaintiffs may apply a monthly interest charge of 1.5% to the outstanding Invoice.

40. As of the date of this claim, Prysm has refused to pay Wharton the invoiced amount of $2,937,637, plus interest in the amount of at least $2,008,995 (which continues to accrue), totaling at least $4,946,632 due under the Agreement.

41. Beginning in 2021 and continuing through 2022 and in the years that followed, Prysm began making extraordinary cash distributions to its three shareholders, Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder. The purpose of these distributions was to enrich the shareholders to the detriment of Prysm's creditors, and to ensure that Prysm would not be able to meet its financial obligations to Wharton and pay to Wharton its 40% share of the tuition revenue that Prysm received from the two courses that were launched in 2022.

42. In 2021, Prysm earned $11,348,784 in total income and reported $2,712,632 in total

expenses, yielding a net operating income of $8,636,152. Adjusting for other income, Prysm's 2021 net income was $8,916,198.

43. In 2021, Prysm's total assets were $3,501,752, Prysm's total liabilities were $141,521, and Prysm's total equity was $3,501,752.

44. In 2021, Prysm made cash distributions of more than $6 million to its shareholders, as follows: $3,267,098 to Guido Molinari, $1,575,917 to John Reed Cataldo, and $1,624,715 to Stephanie Hurder.

45. In 2022, Prysm earned $10,848,568 in total income and reported $5,281,128 in total expenses, yielding a net operating income of $5,567,440. Adjusting for other income, Prysm's 2021 net income was $5,571,303.

46. In 2022, Prysm's total assets were $1,895,613; its total liabilities were $210,657; and its total equity was reduced to $1,684,955.

47. In 2022, Prysm distributed cash in the amount of more than $7 million to its shareholders, as follows: $3,618,918 to Guido Molinari, $1,813,364 to John Reed Cataldo, and $1,814,616 to Stephanie Hurder.

48. In 2022, Prysm also paid salaries to its officers in the amount of $648,000 and paid bonuses of $272,465. As a result of these shareholder distributions, salaries and bonuses, at the end of 2022 Prysm had just $1,305,613 in remaining cash despite its knowledge that, in January 2023, it owed Wharton approximately $3 million based on its contractual right to receive 40% of the more than $8.5 million in tuition revenues Prysm received for the two courses. Defendants made or caused to be made these extraordinary cash distributions so that Prysm would have insufficient assets to pay the amount it owed to Wharton in early 2023, and to place Prysm's corporate assets beyond the reach of Wharton.

49. When it received Wharton's invoice in February 2023 for approximately $3 million, Prysm had no ability to pay it because it diverted most of its cash by that time to Molinari, Cataldo and Hurder and, instead, filed a lawsuit against Wharton. *See Prysm Group LLC v. Trustees of the University of Pennsylvania et al.*, Case No. 23-cv-00995-MKC (E.D. Pa.) (the "Prysm-Wharton Litigation").

50. Upon information and belief, Wharton's termination of the Agreement on February 7, 2023 terminated Prysm's primary source of revenue.

51. Upon information and belief, Prysm continues to be undercapitalized following its transfers to its shareholders and is unable to satisfy a judgment against the company.

52. Prysm's transfers were made without receiving reasonably equivalent value in exchange, leaving Prysm insolvent or with unreasonably small amounts of capital.

53. Prysm knew or reasonably should have known that it would incur debts beyond its ability to pay them as they became due including, among others, its liability to Wharton.

54. On March 13, 2023, Prysm brought suit against Plaintiffs, alleging breach of the Agreement and, in the alternative, breach of an oral agreement to perform consulting services. Prysm alleged damages in excess of $1,000,000. *See* Prysm-Wharton Litigation, Dkt. No. 1-1 at 18, 19. Wharton counterclaimed against Prysm for breaching its contractual obligations to Wharton, including Prysm's refusal to pay Wharton any of its 40% share of the tuition revenues for the courses. The Prysm-Wharton Litigation is ongoing.

55. The deadline for fact discovery in the ongoing matter between Prysm and Wharton was November 20, 2023. *See id.* at Dkt. No. 18.

56. On April 12, 2024, Prysm served an expert report on Wharton. *See id.* at Dkt. No. 47 at 3. Prysm's expert's report identified documents that Prysm's expert, James T. O'Brien

("O'Brien"), considered and relied upon. Specifically, O'Brien reported that he considered and relied upon Prysm's financial statements from 2021 and 2022 and Prysm's profit and loss statement and balance sheet from Prysm's tax return from 2018 through 2022 (collectively, "Prysm's Financial Statements and Tax Returns").

57. On August 1, 2024, Wharton took O'Brien's deposition. O'Brien testified that he had reviewed copies of Prysm's financial statements and tax returns and that, even though they were not specifically referenced in any footnotes within his report, he nonetheless relied on them as part of his analysis. *See id.* at Dkt. No. 52-1 at 3.

58. On March 6, 2025, Wharton submitted a status report to the court addressing scheduling matters. In its status report, Wharton expressed its contention that "Wharton believes that [Prysm] may have no remaining assets and no ability to pay a judgment in this case should one be entered against it by the Court. This raises significant questions about how [Prysm] disposed of more than $8 million in tuition payments, of which it was obliged to pay a 40% share to Wharton under its contract." *Id.* at Dkt. No. 47 at 4 n.2.

59. On March 13, 2025, Prysm and Wharton appeared before the court for a Rule 16 conference. Following the conference, the court entered a scheduling order setting deadlines for expert reports to be due by May 27, 2025. The court also set a deadline for any motions for summary judgment or motions to exclude expert testimony to be due by August 11, 2025.

60. On April 7, 2025, Wharton moved to compel the production of Prysm's Financial Statements and Tax Returns relied upon by O'Brien. *Id.* at Dkt. No. 52. Prysm responded with a brief in opposition on April 21, 2025. *Id.* at Dkt. No. 54. Wharton replied in further support of its motion to compel on April 22, 2025. *Id.* at Dkt. No. 55.

61. On May 22, 2025, the court granted Wharton's motion to compel the production of

Prysm's Financial Statements and Tax Returns relied upon by O'Brien and extended the deadline to serve expert reports until June 6, 2025. *Id.* at Dkt. No. 56.

62. Wharton discovered Prysm's fraudulent conveyance after May 29, 2025, when it received Prysm's Financial Statements and Tax Returns for the years 2018 through 2022.

63. Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder acted intentionally and with the intent to defraud Wharton and to shield Prysm and themselves from Prysm's contractual liability to Wharton.

64. As a direct and proximate result of the conduct of Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder, Wharton has suffered damages of more than $2,937,637, for which Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder are jointly and severally liable.

**COUNT I**
**Breach of Contract**
**Against Guido Molinari, John Reed Cataldo, and Stephanie Hurder**

65. Wharton incorporates herein by reference the allegations set forth in paragraphs 1 through 64, as though they were set forth fully here.

66. As explained above, Wharton and Prysm entered into written agreements for the online classes related to the "Economics of Blockchain and Digital Assets Executive" and the "Metaverse Economy." *See generally* Agreement.

67. The Agreement provided, among other things, that Prysm would pay outstanding invoices thirty days after the invoice is issued by Wharton. *See* Agreement at § 10.2.

68. On February 7, 2023, Wharton issued Invoice No. WOL-0020839 in the amount of $2,937,637 billed to Prysm.

69. Thus, the $2,937,637 billed in the Invoice was payable by Prysm to Wharton on

March 9, 2023, thirty days after it was issued by Wharton.

70. Despite repeated demand, Prysm has not paid the outstanding Invoice.

71. The Agreement is a valid and binding contract between Wharton and Prysm.

72. Prysm breached the Agreement by, among other things, refusing to pay the amounts invoiced by on February 7, 2023 within the time provided under the Agreement.

73. Accordingly, Prysm has been and continues to be in default of and materially in breach of the terms of the Agreement for failure to timely pay the Invoice.

74. As a direct result of this material breach of the Agreement by Prysm and failure to pay the Invoice, Wharton has been and continues to be damaged in the amount of $2,937,637, plus interest in the amount of at least $2,008,995 (which continues to accrue), totaling at least $4,946,632 due under the Agreement.

75. Prysm also materially breached Section 5 of the Agreement by using the Wharton Marks, including Wharton's name and logo, throughout pitch decks to potential acquirors. Prysm also disclosed the financial and other terms of the Agreement and the SOWs to potential investors and acquirors, thereby violating the confidentiality provision of Section 11 of the Agreement. Wharton therefore was entitled to terminate the Agreement for cause per Section 12.3 of the Agreement.

76. Pursuant to Section 10.2 of the Agreement, Wharton is also entitled to its attorney's fees and costs in this action. *See* Agreement at § 10.2

77. It is necessary to pierce the corporate veil to protect against Prysm's fraudulent transfer of its corporate assets to its shareholders, Guido Molinari, John Reed Cataldo, and Stephanie Hurder.

78. All conditions precedent necessary to commence this action have been satisfied.

79. Wharton seeks to pierce the corporate veil of Prysm and hold Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder personally, jointly and individually liable for the breach of contract and resulting damages caused by their conduct individually and through the corporate entity, Prysm Group, LLC, that each controlled.

WHEREFORE, Wharton respectfully requests that Court enter judgment in its favor and against Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder for $2,937,637, plus accrued interest, in addition to Wharton's attorney's fees and costs and such other and further legal and equitable relief as this Court deems appropriate and just.

**COUNT II**
**Fraudulent Conveyance**
**Under the Pennsylvania Uniform Voidable Transactions Act (12 Pa. C.S.A. § 5104)**
**Against Guido Molinari, John Reed Cataldo, and Stephanie Hurder**

80. Wharton incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as though they were set forth fully here.

81. Prysm's cash distributions to its shareholders, Guido Molinari, John Reed Cataldo, and Stephanie Hurder, constitute a fraudulent conveyance under the Pennsylvania Uniform Voidable Transactions Act, as they were made without receiving a reasonably equivalent value in exchange for the transfers and with actual intent to hinder, delay or defraud Wharton, Prysm's largest creditor.

82. Following the transfers, Prysm was engaged in a business for which the remaining assets were unreasonably small in relation to the business.

83. Prysm owed Wharton at least $2,937,637 under the terms of its Agreement with Wharton, which was payable by Prysm to Wharton by March 9, 2023.

84. However, with full knowledge of its financial obligation to make this payment to

Wharton in early 2023, Molinari, Cataldo and Hurder caused Prysm to make cash distributions directly to themselves for the purpose of enriching themselves at the expense of Wharton, which was Prysm's largest and most important creditor. As a result of these fraudulent cash distributions, Prysm was rendered insolvent and rendered unable to make the payment that it owed to Wharton which far exceeded Prysm's assets at the time the payment was due.

85. Under the Pennsylvania Uniform Voidable Transactions Act, a claim for relief is valid if the action is brought not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant. *See* 12 Pa. C.S.A. § 5109.

86. As a direct and proximate result of Prysm's fraudulent conveyance to Defendants, Wharton has suffered damages of more than $2,937,637, representing the amount owed to Wharton pursuant to the Agreement between Wharton and Prysm invoiced by Wharton on February 7, 2023.

WHEREFORE, Wharton respectfully requests that this Court enter judgment in its favor and against Guido Molinari, John Reed Cataldo, and Stephanie Hurder and declare the transfer of assets from Prysm to Guido Molinari, John Reed Cataldo, and Stephanie Hurder to be fraudulent and void under the Pennsylvania Uniform Fraudulent Transfers Act, order the return of the fraudulently transferred assets to Prysm for the benefit of Wharton and other creditors, award Wharton compensatory damages in the amount of $2,937,637, plus interest, in addition to Wharton's attorney's fees and costs and such other and further legal and equitable relief as this Court deems appropriate and just.

**COUNT III**
**Unjust Enrichment**
**Against Guido Molinari, John Reed Cataldo, and Stephanie Hurder**

87. Wharton incorporates by reference the allegations set forth in paragraphs 1 through

86, as though they were set forth fully here.

88. Wharton conferred substantial benefits upon Defendants by way of Defendants' ownership and control in Prysm Group LLC, including but not limited to unpaid revenues from online courses in the amount of $2,937,637 to which Wharton was entitled.

89. Defendants knowingly accepted, retained, and benefitted from these benefits by way of transfers from Prysm to Defendants in 2021 and 2022.

90. As principals of Prysm, Defendants knew that Prysm owed unpaid course revenues to Wharton.

91. Even so, Defendants knowingly accepted, retained, and benefitted from the above described monetary transfers in 2022 and 2023, and, rather than paying any of the amounts owed to Wharton, continue to retain all of the benefits of those monetary transfers for themselves to this day.

92. Defendants appreciated and had knowledge of the benefits conferred by Wharton because Wharton identified the benefits that it conferred in its February 7, 2023 demand letter.

93. Under the circumstances, it would be inequitable and unjust for Defendants to retain the benefits conferred without payment of fair value to Wharton.

94. As a direct and proximate result of Defendant's retention of these benefits without compensation, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Wharton respectfully requests that Court enter judgment in its favor and against Defendants Guido Molinari, John Reed Cataldo, and Stephanie Hurder for $2,937,637, plus accrued interest, in addition to Wharton's attorney's fees and costs and such other and further legal and equitable relief as this Court deems appropriate and just.

Dated: February 27, 2026

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: */s/ John J. Pease*
Michael L. Banks, (PA Atty. ID No. 25052)
michael.banks@morganlewis.com
John J. Pease III (PA Atty. ID No. 66151)
john.pease@morganlewis.com
Michael B. Krone (PA Atty. ID No. 336420)
michael.krone@morganlewis.com

2222 Market Street
Philadelphia, PA 19103-3007
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001

**SIRLIN, LESSER & BENSON, P.C.**
*/s/ Patrick J. Troy*
Patrick J. Troy (PA Atty. ID No. 89890)
ptroy@sirlinlaw.com
123 South Broad Street, Suite 2100
Philadelphia, PA 19109

*Attorneys for Plaintiffs*
Trustees of the University of Pennsylvania and Aresty Institute of Executive Education at The Wharton School